## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**THE ESTATE OF KIM A. LEACH**
**Deceased, by and through**
**KAREN LEACH INGLETT, as**
**The Personal Representative of his Estate**

      **Plaintiffs,**

**vs.**                                 **CASE NO.**

**TALLAHASSEE MEMORIAL**
**HEALTHCARE, INC.,**

      **Defendant.**
_____/

## COMPLAINT

COMES NOW, Plaintiff, The Estate of KIM A. LEACH Deceased, by and through KAREN LEACH INGLETT, as Personal Representative of his Estate (hereinafter referred to as CMSgt LEACH) shall hereinafter be referred to as Plaintiff), by and through undersigned counsel, and file this Complaint and sue Defendant, TALLAHASSEE MEMORIAL HEALTHCARE, INC., (hereinafter referred to as "Defendant" or "TMH"), and allege as follows:

## GENERAL ALLEGATIONS

## JURISDICTION

1.     This is an action for damages resulting from violations of 42 U.S.C. § 1395dd, *et seq.*, more commonly known as the Emergency Medical Treatment and Active Labor Act (hereinafter "EMTALA"), and arises under the express private right of action created thereby.

Additionally, this action includes a claim for damages resulting from medical negligence pursuant to Chapter 766, Florida Statutes.

2.      This Court has original jurisdiction over the EMTALA claims pursuant to 28 U.S.C. § 1331.  Further, this Court has original jurisdiction over the medical negligence claims pursuant to 28 U.S.C. § 1332 in that the Plaintiff resided in Wibaux, Montana and Defendant Tallahassee Memorial Healthcare, Inc. (TMH) where its' principle place of business is located in Tallahassee, Florida and the amount in controversy is in excess of $75,000.00 exclusive of interest and costs.

## VENUE

3.      Venue is proper in the Northern District of Florida pursuant to 28 U.S.C. § 1391(b)(1) and (2) in that Defendant TMH has its principal place of business in the Northern District of Florida.  Additionally, venue is proper in the Northern District of Florida as all of the events or omissions giving rise to this claim occurred within the Northern District of Florida.

4.      Therefore, venue properly lies in this Honorable Court pursuant to 28 U.S. § 1391(b) (1) and (2).

## PARTIES

5.      Plaintiff, CMSrgt Kim Arthur Leach, was a citizen of the United States and resided in Wibaux, Montana, and died in, Leon County, Tallahassee, Florida.  At the time of his retirement Mr. Leach was a Master Sergeant in the United States Airforce.

6.      TMH owns and operates a freestanding off campus Emergency Center, known as *The Emergency Center – Northeast* (TMH NE).  TMH NE operates out of a 44,000 square foot free standing emergency center having 32 beds.  TMH Northeast advertises that it has the ability

2

to transfer patients to Tallahassee Memorial Hospital (main campus for admission) via emergency transportation at no cost to the patient.

7.      TMH Main Campus is located at 1300 Miccosukee Road. That location houses a full-service hospital and regional healthcare center, licensed under Chapter 395, Florida Statutes, in Leon County, Florida, which offers emergency care, surgical care, and is designated a Level II Trauma Center.  Further, TMH advertises on its website the following:

   a.      that it is the only Level II Trauma Center in the Big Bend Region;

   b.      that it has an on campus emergency center, staffed by  physicians which are board-certified in emergency medicine and its staff is specialty trained; and

   c.      that its emergency center facility has a rapid response lab and digital imaging, including a CT scanner and two X-Ray units, located within the TMH emergency center.

8.      As such, based on the foregoing, TMH and TMH NE are "health care providers" as defined by Section 766.202(4), Florida Statutes, regulating medical malpractice claims.

9.      TMH and TMH NE are a "participating hospital" as such term is defined in 42 U.S.C. § 1395dd(e)(2) and, subject to 42 C.F.R. § 489, thus subject to the requirements of Emergency Medical and Labor Treatment Act (EMTALA). TMH NE is a Hospital-Based Off-Campus Emergency Department, thus subject to EMTALA.

10.     EMTALA requires that a patient must be provided with an appropriate medical screening examination.  EMTALA also requires that the medical screening examination must be conducted by individuals determined to be qualified by TMH bylaws to provide medical screening evaluations.

11.     The purpose of an EMTALA medical screening examination is to determine whether or not the patient has an Emergency Medical Condition (EMC).

12.     If after a screening examination the hospital determines that the patient has an EMC then the hospital must provide treatment to stabilize the medical condition or appropriately transfer the patient to another hospital.

13.     In this instance TMH NE had a duty to stabilize the plaintiff's medical condition and either admit the Plaintiff as a patient or appropriately transfer the Plaintiff to TMH main campus.  However, Defendant TMH NE failed to stabilize the Plaintiff or appropriately transfer the Plaintiff to TMH main campus.

14.     The Plaintiff, although never stabilized, was never transferred to TMH main campus.

15.     It should have became apparent after the Plaintiff's admission to the TMH NE Emergency Room that the Plaintiff should have been immediately transferred to the TMH main campus emergency room after an "an appropriate medical screening examation".  It is uncertain from the medical records whether or not or when the Plaintiff was examined by a qualified individual.

16.     At the time of admission to TMH NE, approximately at 1:48 a.m. the Plaintiff and his daughter, Karen Inglett, walked into the reception area and advised a triage nurse that the Plaintiff had a slightly swollen tongue apparently resulting from anaphylaxis.

17.     At the time of admission, the Plaintiff was suffering from an emergency medical condition.  For purposes of EMTALA an emergency medical condition is defined as a medical condition manifesting itself by acute symptoms of sufficient severity such that the absence of

4

immediate medical attention could reasonably be expected to result in – placing the health of the individual in serious jeopardy.

18.     TMH NE, at triage, should have determined that the Plaintiff was suffering from an emergency medical condition. The facility should have provided immediate treatment to stabilize the Plaintiff's emergency medical condition[1], or absent of stabilization admit the Plaintiff to one of the 32 medical beds maintained at TMH NE. In the event the Plaintiff could not be stabilized or admitted[2], transfer the Plaintiff to another facility. TMH NE failed to stabilize the Plaintiff, admit the Plaintiff, or transfer the Plaintiff to another facility.  The two closest facilities for transfer would have been Capital Regional Medical Center or TMH main campus.

19.     The Plaintiff was admitted at 1:49 a.m. The medical records indicate that the Plaintiff died at 3:21 a.m.

## FACTUAL SYNOPSIS

20.     On March 24, 2017, at approximately 1:49 a.m., Plaintiff was admitted to TMH NE triage with classic symptoms of anaphylaxis. Plaintiff walked into the facility with his daughter, Karen Inglett.

21.     At 1:52 a.m. while Plaintiff was in triage his vital signs were taken and the medical records indicates that his oxygen saturations were at 99% with an elevated blood pressure and lethargic. The Plaintiff was described in the medical records as having a severe swollen tongue[3].  Plaintiff presented with an elevated heart rate 95 bpm; respiration rate of 18 br-

---

[1] TMH NE advertises on their website that it has "two technologically advanced resuscitation rooms", its unknown whether or not Plaintiff was placed in one theses advanced resuscitation rooms.
[2] It's unclear as to whether or not TMH NE hospital beds were general med beds or had the capability for critical care.
[3] However, this size of the Plaintiffs tongue as described in the medical records is inconsistent with the autopsy photos

m; elevated blood pressure 190/134; Pulse ox of 8%[4]; CO2 level of 21.7 mEq/L, which is slightly below normal, taken at 1:58 a.m.; and Plaintiff was conscious, albeit, slow and lethargic.

22.     At 1:58 a.m. labs were ordered and were not returned until 2:27 a.m., a delay of approximately 30 minutes.

23.     The medical records indicate that there were no medical interventions between 1:52 a.m. to 2:25 a.m., or a time of 33 minutes.

24.     At 2:25 a.m. the chart indicates that Mr. Leach was being provided oxygen by ambu bag.

25.     At no time was it charted in the medical records that an anesthesiologist was called to the emergency room. An emergency room respiratory therapist charted in the record, at 4:00 a.m., as having been called to assist the emergency room physician in multiple intubation attempts. It's unclear as to when the RT came to assist the emergency room physician.

26.     The medical records indicated the first attempt at intubation occurred at 2:26 a.m. There was no indication as to why this intubation was not successful, in that there had not been any injury to the airway or attendant bleeding at that time.

27.     The record indicates that the emergency room physician did not begin treatment for 33 minutes after Plaintiff arrived at the emergency room.

28.     The emergency room physician, although not a board certified emergency room physician at the time, served a two year residency in emergency medicine in Shreveport, Louisiana and should have been well capable of intubating the patient and preforming the emergency cricothyrotomy.

---

[4] This reading is obviously incorrect. To the extent that the Plaintiff actually had a pulse ox reading of 8%, he would have been unable to walk in from the car.

29.     After the first cricothyrotomy had failed, a qualified nurse or inhalation therapist could have performed the intubation or the cricothyrotomy.  The records show that an inhalation therapist was called however, there is no indication as to what time the therapist was called.

30.     Plaintiff's daughter Karen Inglett, who was waiting in the hallway of the treatment room, began to text her mother and her husband concerning her father at approximately 1:15 a.m. and ending at 3:20 a.m., the information contained in Mrs. Inglett's text messages was provided to her by a nurse that was in and out of the trauma room where her father was being treated.  There was a notation in one of the text messages that Dr. Becker arrived at 2:55 a.m. By that time the Plaintiff had clearly suffered an irreparable hypoxic brain injury, was minutes away from dying, and may have already died.

31.     The records do not indicate what time Dr. Becker was called to come to the hospital.

32.     Plaintiff's airway was not charted as being established until 2:56 a.m., per the resuscitation records. The resuscitation record indicated that an endotracheal tube was placed at that time.

33.     At 3:21 a.m. the ER physician called time of death, however, at 3:25 a.m. the EKG strips show some electrical activity, with a flat line presenting at 3:26 a.m.

34.     Dr. Becker's Operative Note indicates that she, finally was able to stop the bleeding in the right thyroid cartilage and larynx[5], thus allowing visualization of the vocal cords. Dr. Becker's dictation for her Operative Report commenced at 3:31 a.m. shortly after the death of the Plaintiff.

---

[5] Dr. Becker noted that bleeding was from the right thyroid cartilage and larynx. This injury happened when the ER Physician was attempting to place an endotracheal tube. The ER Physicians notes indicate that the bleeding was from a history of "possible dental trauma". The autopsy of the Plaintiff does not indicates that there was not injury to the tongue and that the only injury was in the neck area due to a "hemorrhage within the anterior strap muscles due to previous emergent tracheostomy".

35.     The scribe makes no mention of Dr. Becker's arrival in the room, other than to note that at 2:56 a.m., an ET tube was finally placed.  It appears that Dr. Becker was the only physician in the room that was able to control a bleed caused by a failed intubation as described in the autopsy, or one of "several attempts at a cricothyrotomy".

## COUNT I – VIOLATIONS OF 42 U.S.C. § 1395dd

36.     Plaintiff, Leach, reallege and reaffirms the allegations set forth in paragraphs 1 through 35 above as if set forth fully herein, and sues Defendant TMH.

37.     Tallahassee Memorial Healthcare, Inc. TMH Physician Partners, and TMH Physician Partners – Emergency Services health care providers failed to:

     a.   Properly triage the patient thus, identify the patient as needing immediate transfer to TMH Main Campus, a healthcare provider much more capable of dealing with the Plaintiff's emergency; or

     b.   Provide Plaintiff with the emergent treatment necessary to stabilize the Plaintiff or transfer the Plaintiff, and failing to summon the on-call anesthesiologist or the on-call ENT when the Plaintiffs first pulse ox reading indicated the Plaintiff had a pulse ox of 8%.

38.     Tallahassee Memorial Healthcare, Inc. TMH Physician Partners, and TMH Physician Partners – Emergency Services health care providers failed to stabilize the Plaintiff or immediately transfer the Plaintiff as required by EMTALA, and by waiting until 2:25 a.m. to order oxygen to be administrated to Plaintiff.

39.     Tallahassee Memorial Healthcare, Inc. TMH Physician Partners, and TMH Physician Partners – Emergency Services health care providers failed to stabilize or transfer the

Plaintiff, and by waiting until 2:26 a.m., thirty minutes after initial triage, to attempt the first intubation of Plaintiff.

40.     Tallahassee Memorial Healthcare, Inc. TMH Physician Partners, and TMH Physician Partners – Emergency Services health care providers failed to stabilize or transfer the Plaintiff, and by failing to properly intubate Plaintiff at 2:26 a.m. when the Plaintiff's airway obstruction was charted as moderate (first attempted intubation).

41.     Tallahassee Memorial Healthcare, Inc. TMH Physician Partners, and TMH Physician Partners – Emergency Services health care providers failed to stabilize or transfer the Plaintiff, and by failing to properly preform a cricothyrotomy at 2:29 a.m., which missed Plaintiff's airway by a reported inch and a half.

42.     Tallahassee Memorial Healthcare, Inc. TMH Physician Partners, and TMH Physician Partners – Emergency Services health care providers failed to stabilize or transfer the Plaintiff, and by failing to properly intubate Plaintiff at 2:33 a.m. (second attempted intubation).

43.     Tallahassee Memorial Healthcare, Inc. TMH Physician Partners, and TMH Physician Partners – Emergency Services health care providers failed to stabilize or transfer the Plaintiff, and by failing to properly intubate Plaintiff at 2:44 a.m. (third attempted intubation).

44.     Tallahassee Memorial Healthcare, Inc. TMH Physician Partners, and TMH Physician Partners – Emergency Services health care providers failed to stabilize or transfer the Plaintiff, and by failing to properly intubate the Plaintiff at 2:47 a.m. (fourth attempted intubation).

45.     Tallahassee Memorial Healthcare, Inc. TMH Physician Partners, and TMH Physician Partners – Emergency Services health care providers failed to stabilize or transfer the

Plaintiff, and by failing to properly chart an attempted naso gastric intubation, which is depicted in the autopsy photos, and set forth as a billed item in the billing records.

46.     The acts and omissions of Tallahassee Memorial Healthcare, Inc. TMH Physician Partners, and TMH Physician Partners – Emergency Services violated EMTALA and resulted in the Plaintiff's death.

**WHEREFORE**, Plaintiff, by and through his personal representative, demands judgment against Defendant, TMH, for all damages allowable under EMTALA, including punitive damages, costs and attorneys' fees.

**COUNT II – MEDICAL NEGLIGENCE**
**UNDER CHAPTER 766, FLORIDA STATUTES**

*Vicarious Liability of Defendant, TMH, for the Negligence of*

47.     Plaintiff reallege and reaffirms the allegations set forth in paragraphs 1 through 46 above as if set forth fully herein, and sues Defendant TMH.

48.     The actions alleged in paragraphs 37 through 46 constitute acts of medical malpractice and are deviations from the standard of care by the emergency room doctor and nurses who provided care to the Plaintiff.

49.     There has been full and complete compliance by Plaintiffs with respect to pre-suit notice and all requirements of Chapter 766, Florida Statutes, and precedent to the causes of action pled herein, and this action is being commenced within the applicable statute of limitations.

**WHEREFORE**, Plaintiff demands judgment against Defendant, TMH, for all damages allowable, including recoverable costs incurred in relation to this action.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

**DATED** this 3rd day of August, 2018.

Respectfully submitted,

The Law Offices of
STEVEN R. ANDREWS, P.A.
822 Monroe Street
Tallahassee, Florida 32303
Tel:  (850) 681-6416 * Fax: (850) 681-6984

STEVEN R. ANDREWS (FBN 0263680)
steve@andrewslawoffice.com
RYAN J. ANDREWS (FBN 104703)
ryan@andrewslaw.com
BRIAN O. FINNERTY (FBN 0094647)
brian@andrewslaw.com
service@andrewslaw.com
*Attorneys for Plaintiffs*